**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert M. HANEY, Defendant–
Appellant.**

**No. 00–1421.**

United States Court of Appeals,
Tenth Circuit.

April 22, 2002.

David A. Lane of Miller, Lane, Killmer & Greisen LLP, Denver, CO, for Defendant–Appellant Robert M. Haney.

Andrew A. Vogt, Assistant United States Attorney (Richard T. Spriggs, United States Attorney, with him on the brief), Denver, CO, for Plaintiff–Appellee.

Before HENRY, Circuit Judge, BRORBY, Senior Circuit Judge, and ROGERS, Senior District Judge.[1]

HENRY, Circuit Judge.

Robert M. Haney appeals his conviction and sentence for violation of 18 U.S.C. § 1791(a)(2) (possession of escape paraphernalia in prison). Mr. Haney asserts that the district court erred in (1) not permitting him to raise a defense of duress—a defense the jury accepted, on a related count, as to Mr. Haney's co-defendant—and (2) failing to grant him a reduction in offense level for acceptance of responsibility, pursuant to § 3E1.1 of the United States Sentencing Guidelines. Exercising jurisdiction under 28 U.S.C. § 1291, we vacate Mr. Haney's conviction for possession of escape paraphernalia. Because we vacate Mr. Haney's conviction, we do not reach Mr. Haney's contentions regarding his sentence.

## I. BACKGROUND

Following his escape from prison, the television show "America's Most Wanted" incorrectly described Tony S. Francis,

---

**1.** The Honorable Richard D. Rogers, United States Senior District Judge for the District of Kansas, sitting by designation.

friend and co-defendant[2] of Mr. Haney, as a leader of the Aryan Brotherhood, a prison gang preaching white supremacy. Once recaptured, Mr. Francis found himself housed in the federal penitentiary in Florence, Colorado; Mr. Francis developed anxiety about his incarceration in this facility for at least two reasons. First, Mr. Francis feared the reaction of African-American prisoners because at least some of those prisoners had, in all likelihood, heard the claim of Aryan Brotherhood membership made by "America's Most Wanted." Second, Mr. Francis feared the reaction of members of the Aryan Brotherhood because, in reality, Mr. Francis was not a member of that prison gang.

In 1997, prison authorities became concerned about growing racial tension in the Florence penitentiary; beginning on September 3, 1997, prison authorities "locked down" the penitentiary for ten days. Rec. from *United States v. Francis*, No. 00–1429, 2002 WL 652255 (10th Cir.2002) (unpublished disposition), (hereinafter *"Francis Rec."*) vol. XI, at 483 (testimony of Mark Gaytan). Immediately after prison authorities lifted the lock-down, three African American inmates threatened Mr. Francis. The inmates approached Mr. Francis, told him that they had seen him on "America's Most Wanted," and offered a warning to the effect that: "When the shit jumps off, you know what time it is"— i.e., a race war was brewing and Mr. Francis was a target. *Id.* vol. XV, at 1294–95 (testimony of Mr. Francis); *see also id.* vol. XIV, at 1209 (testimony of Mr. Francis).

Mr. Francis concluded that his only option was to attempt a prison escape. In their respective testimonies, Mr. Francis and Mr. Haney each explained this implicit decision not to seek the aid of the prison authorities as resting on the alleged fact that seeking such aid did not constitute a reasonable alternative. Mr. Francis and Mr. Haney testified that, had Mr. Francis sought such assistance, Mr. Francis and Mr. Haney's fellow inmates would have labeled Mr. Francis a snitch, thereby placing Mr. Francis in further danger. Additionally, according to the testimony of Mr. Francis and Mr. Haney, because the special housing units were far from free from violence, placing Mr. Francis in protective custody would also have proven of limited benefit.

Mr. Haney agreed to help Mr. Francis in Mr. Francis' attempted escape. Mr. Haney used his position as an employee in the prison laundry to collect a variety of escape paraphernalia. On September 26, 1997—approximately two weeks after the initial threat—Mr. Francis was shown a "kite" (a note) in which an inmate commented that Mr. Francis was still considered a target. *Id.* vol. XIV, at 1170 (testimony of Joseph McGee). This threat provided renewed impetus for the escape attempt.

On the night of October 3, 1997, Mr. Francis and Mr. Haney gathered the collected escape paraphernalia and hid in the prison yard. As they hid, however, Mr. Haney endeavored to convince Mr. Francis that an escape attempt was, in fact, imprudent; Mr. Haney argued, in effect: "[T]he best possible solution would be to get caught trying to escape, thereby getting placed into disciplinary segregation without having to report the death threats to prison officials." Aplt. Francis' Br. at 14; *see, e.g., id.* vol. XV, at 1425–27 (testimony of Mr. Haney). Mr. Francis ultimately agreed. After two hours of strewing the

---

**2.** While Mr. Haney and Mr. Francis were tried jointly, we have considered and decided Mr. Francis' appeal separately. *See United States v. Francis*, No. 00–1429, 2002 WL 652255 (10th Cir.2002) (unpublished disposition).

yard with the escape paraphernalia, the two inmates were finally caught.

The United States charged both Mr. Francis and Mr. Haney with 1) violation of 18 U.S.C. § 1791(a)(2) (possession of escape paraphernalia in prison) and 2) violation of 18 U.S.C. § 751(a) (attempted escape). As to Mr. Francis, the district court instructed the jury on the duress defense in regard to both counts; as to Mr. Haney, however, the court refused to give a duress instruction on either count. The jury convicted both Mr. Francis and Mr. Haney of possessing escape paraphernalia but acquitted both Mr. Francis and Mr. Haney of attempting to escape. In acquitting Mr. Francis of the attempted escape, the jury expressly invoked the duress defense. *See* Francis Rec. vol. I, doc. 218 (verdict form).

## II. DISCUSSION: Applicability of the Duress Defense

 Mr. Haney argues that he was entitled to present a duress defense to the jury.[3] In order to have a theory of defense submitted to the jury, a defendant must present sufficient evidence, on each element of the defense, by which the jury could find in the defendant's favor. Indeed, a "defendant is entitled to jury instructions on any theory of defense finding support in the evidence and the law. Failure to so instruct is reversible error." *United States v. Scafe,* 822 F.2d 928, 932 (10th Cir.1987); *see also, e.g.,* 2A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 482, at 346–48 (3d ed. 2000) ("A party is entitled to a specific instruction on his theory of the case if there is evidence to support it and a proper request for such an instruction is made."); *United States v.*

*Lofton,* 776 F.2d 918, 920 (10th Cir.1985) (vacating a conviction for failure of the jury instructions to adequately apprise the jury of the defendant's theory of defense: "When a criminal defendant has raised a theory of defense, the trial court should refer to that theory and to the testimony bearing on it and submit the issue with an instruction on the applicable law. The jury should be advised of the defendant's position so as to put the issues raised by the theory of defense squarely before it.") (citations omitted); *United States v. Lewis,* 592 F.2d 1282, 1286 (5th Cir.1979) (vacating a conviction for failure of the jury instructions to adequately apprise the jury of the defendant's theory of defense: "[In considering] whether the instruction should have been given, allowing the jury to consider the defense thus raised, *we must accept the testimony most favorably to the defendant.*") (emphasis added). The district court concluded that Mr. Haney failed to present sufficient evidence as to the elements of the duress defense and thus that the duress defense was, as a matter of law, inapplicable to Mr. Haney.

 As defined in the recent caselaw of our circuit, the duress defense typically consists of three elements:

1) The threat of immediate infliction, upon the defendant, of death or bodily harm;

2) The defendant's well-grounded fear that the threat will be carried out; AND

3) The defendant's lack of a reasonable opportunity to otherwise avert the threatened harm.

*See United States v. Glass,* 128 F.3d 1398, 1409 (10th Cir.1997); *United States v.*

---

**3.** Interestingly, Mr. Haney's counsel offered, at least once, to abandon pursuit of the duress defense if the government would agree not to pursue an 'aiding and abetting' theory as to the charged attempted escape; the government, however, declined to accept the offer. *See* Francis Rec. vol. VII, at 27 (transcript of status conference).

*Scott,* 901 F.2d 871, 873 (10th Cir.1990). By his own admission, Mr. Haney cannot meet the elements of the duress defense, as described above. Quite basically, Mr. Haney makes no allegation that he ever feared for his own safety. Mr. Haney seeks to overcome this obstacle by proposing an extension of the duress defense; Mr. Haney argues that the duress defense should encompass defendants who correctly recognize that another individual's safety is at risk. Thus, Mr. Haney would describe the elements of the duress defense as requiring:[4]

1) The threat of immediate infliction, upon the defendant *or a third person,* of death or bodily harm;

2) The defendant's well-grounded fear that the threat will be carried out; AND

3) The defendant's, *and third person's,* lack of a reasonable opportunity to otherwise avert the threatened harm.

The government presents no argument that the duress defense should not extend, in at least certain circumstances, to third parties, thereby essentially conceding the point. *See* Aple's Br. at 17–18 ("[C]ourts have recognized that a defendant may establish a duress defense as a result of threats against family members."). Rather, the government presses two grounds on which we might nevertheless conclude, as a matter of law, that the duress defense is here unavailable to Mr. Haney. The government first suggests that the duress defense should be extended to third parties only where the defendant enjoys a familial relationship with the threatened individual. Second, the government suggests that Mr. Haney produced inadequate evidence to create a jury question as to either the first or third element of the duress defense. We address these arguments in turn.

## A. Third Party Duress

### 1. Whether the duress defense should ever extend to third parties

■ Despite the fact that the government essentially abandons this position (presenting no argument and citing no cases or other legal authority), we begin our discussion of third party duress by considering whether the duress defense should ever be available when a third party (a party other than the defendant) is threatened with death or bodily harm. Logic and overwhelming legal authority conjoin in establishing that the duress defense should, indeed, extend to third parties.

The principle underlying the duress defense is one of hard-nosed practicality: sometimes social welfare is maximized by forgiving a relatively minor offense in order to avoid a greater social harm. *See* 1 WAYNE R. LaFAVE & AUSTIN W. SCOTT. JR., SUBSTANTIVE CRIMINAL LAW § 5.3(a), at 614–15 (1986) ("The rationale of the duress defense is that . . . ., even though [the defendant] has done the act the crime requires and has the mental state which the crime requires, [the defendant's] conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude."); JOHN LAWRENCE HILL, A UTILITARIAN THEORY OF DURESS, 84 IOWA L.REV. 275, 321 (1999) ("[T]he criminal law's recognition of the defense of duress is utility-maximizing."). Where A, with apparent

---

4. The defense of duress, as formulated by Mr. Haney, remains distinct from the 'defense of another' defense in that 'defense of another' scenarios feature the defendant taking action directly against the threatening individual(s), while a 'third party duress' scenario would involve the defendant taking any other course of action. *Cf.* 1 WAYNE R. LaFAVE & AUSTIN W. SCOTT. JR., SUBSTANTIVE CRIMINAL LAW § 5.3, at 615 n. 6 (1986).

credibility, threatens to shoot B unless B jaywalks (and where B, in fear of the threat, possesses no reasonable opportunity to otherwise avert the shooting), the law excuses B's relatively minor offense in order to avoid the greater social harm threatened by A. The same logic dictates that so, too, where A, again with apparent credibility, threatens to shoot B unless C jaywalks, the defense of third party duress should excuse C's relatively minor offense (at least so long as (1) C actually feared that A would execute the shooting and (2) neither B nor C possessed a reasonable alternative to otherwise avert the shooting).

Commentators and the caselaw agree that the duress defense should extend to the defense of third parties. Leading criminal law scholars Wayne R. LaFave and Austin W. Scott, Jr. have noted, first, that "[t]he overwhelming majority of [state duress statutes] extend to threats of harm to third parties" and, second, that "as a matter of principle, the threatened harm need not be directed at the defendant himself." LaFave and Scott, supra, § 5.3(b), at 621; § 5.3(c), at 624. The scholar-drafters of the Model Penal Code concur. Section 2.09(1) of the Code provides: "It is an affirmative defense that the actor engaged in the conduct ... because he was coerced to do so by the use of, or a threat to use, unlawful force against his person *or the person of another*." (Emphasis added). *See also, e.g.*, HILL, A UTILITARIAN THEORY OF DURESS, 84 IOWA L.REV. at 325 ("[T]he [duress] defense should not be limited to situations in which the defendant, rather than a third party, is threatened.").

The federal case law is apparently uniform in extending the duress defense to threats against third parties. *See, e.g.*, *United States v. Liu*, 960 F.2d 449, 454 (5th Cir.1992) ("It is clear that the jury should be informed that the [duress] de-fense is available if the defendant proves that he, or a member of his family, was under a present, imminent, or impending threat of death or serious bodily injury."); *United States v. Santos*, 932 F.2d 244, 251–53 (3d Cir.1991) (stating that, "[i]f [the defendant] had made [a] specific objec-tion[ ] ..., it is reasonable to assume that the district court would have ... instruct-ed the jury that [the defendant] could uti-lize the alleged threats to her children to establish duress" and further noting that "the district court gave [the defendant] wide latitude to introduce evidence con-cerning her fears about threats ... against her children"); *United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir.1990) ("[W]e believe ... that a claim that a defendant's family has been threatened might help es-tablish the defense of duress or coer-cion."); *United States v. Lopez*, 885 F.2d 1428, 1434–36, 1438–39 (9th Cir.1989) (as-suming that the duress defense applies to the defense of a girlfriend), *overruled on other grounds by Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); *United States v. Con-tento–Pachon*, 723 F.2d 691, 693–94 (9th Cir.1984) (recognizing the applicability of the duress defense where a defendant act-ed under threats to both himself and his family). We know of no federal case cate-gorically declining to apply the duress de-fense in the third party context.

**2. Whether the duress defense, once extended to third parties, should be limited to third parties with a familial relationship to the defen-dant**

It is true that, as the government ob-serves, most cases of third-party duress involve familial relationships between the defendant and the threatened individual; however, neither logic nor practicality sup-ports such a 'family relationship' limitation. Returning to our basic illustration of the

duress defense above, why should it matter whether C (who jaywalks in order to prevent A from shooting B) enjoys a family relationship with B; in either case, permitting C to jaywalk avoids the greater social harm. Professors Scott and LaFave agree: "[A]s a matter of principle, the threatened harm need not be directed at the defendant himself; it may be aimed at a member of his family *or a friend (or, it would seem, even a stranger*)." LaFave & Scott, supra, § 5.3(c), at 624 (emphasis added). *See also, e.g.,* Model Penal Code § 2.09(1) (declining to limit the duress defense to parties enjoying a familial relationship: "It is an affirmative defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person *or the person of another.*") (emphasis added); *cf.* LaFave & Scott, supra, § 5.8(a), at 664 (noting, in the context of the 'defense of another' defense, that, while "[s]ome early English cases suggested that force may not be used in defense of another unless the defender stands in some personal relationship to the one in need of protection[,] .... the modern and better rule is that there need be no such relationship").

Indeed, as Professor Hill has written, the applicability of the duress defense may be particularly important precisely where B and C are not related because it is in this circumstance that C may need greater reassurance before risking criminal punishment in order to improve the well-being of B.

> [T]hird parties are in special need of protection in situations where the defendant may have no great incentive to protect the third party [i.e., where the defendant and the threatened party are

not bonded by familial ties]. Permitting the defense [of duress] in these situations allows the defendant to succumb to the threat without fear of punishment, rather than risk the safety of the third party. In sum, the law should extend the defense to this situation precisely because the actor might not be sufficiently coerced to act in a situation where we should encourage such an act.

Hill, A Utilitarian Theory of Duress, 84 Iowa L.Rev. at 325.

Not only is the government's 'family members only' limitation unprincipled, it is unworkable. Under the government's proposed limitation, the duress defense would presumably remain available where B and C enjoy a mother-son or husband-wife relationship but not where B and C merely find themselves seated next to each other on a public bus. A family relationship, however, is somewhat difficult to identify: what of a couple engaged to be married, an aunt and nephew, in-laws, distant cousins who know each other well, siblings who have never met, unmarried co-habitants, etc.?[5] The government's failure to offer guidance on these issues is surely a product of the unprincipled line drawn by the 'family relationship' test.

It is, then, hardly surprising that, in the only federal case (at least the only one to which we have been cited or been able to discover through our own research) to explicitly address the duress defense in the context of an unrelated defendant and threatened party, the Ninth Circuit did not even pause to consider whether the duress defense might not apply in such a situation. *See Lopez,* 885 F.2d at 1434–36, 1438–39. *Lopez* involved a defendant invoking the duress defense after flying a helicopter into a federal prison in order to

---

5. And, again, how are any of these relationships meaningfully distinct, for purposes of application of the duress defense, from the relationship between two close friends, long-time roommates, work colleagues, a teacher and student, etc.?

avert a threatened harm to his "girl-friend," an inmate in that prison. *Id.* at 1430. Rather than struggle over whether a non-marital romantic attachment may constitute a 'family relationship,' the Ninth Circuit moved directly to consideration of whether the defendant had established the substantive elements of the duress defense. *See id.* at 1434–36, 1438–39. Just as we know of no federal case categorically declining to apply the duress defense in the third-party context, we know of no federal case categorically limiting the third party duress defense to defendants who happen to enjoy a family relationship to the threatened individual.

█ In sum, we see no principled justification for limiting the duress defense to defendants whose own safety is threatened. Nor do we see any justification for limiting the duress defense to defendants in a familial relationship with the threatened individual. Such distinctions would be arbitrary and unjust. As Mr. Haney correctly observes, the duress defense is appropriately defined not by "the nature of the relationship between the alleged law-breaker and the beneficiary third party" but by the "nature of the crime committed and the benefit conferred upon the third party." Aplt's Reply Br. at 2.[6]

## B. Sufficiency of the Evidence

Nor can we accept the government's argument that Mr. Haney failed to produce adequate evidence to create a jury issue on either the first or third element of the duress defense. Here, of course, the government's position is weakened (though not logically foreclosed) by the fact that the jury explicitly invoked the duress defense to acquit Mr. Francis of the charged attempted escape. The fact that the jury, hearing much of the same evidence that Mr. Haney would have applied toward his own duress defense, accepted the duress defense in a related context suggests that Mr. Haney did, indeed, offer sufficient evidence.

### 1. Whether Mr. Haney presented sufficient evidence as to the first element of the duress defense

█ The first element of the duress defense requires a threat of immediate inflic-

---

**6.** While the government has not explicitly argued the point, we briefly consider, and reject, the notion that the prison context of this case should control the applicability of the duress defense. The prison environment does present unique circumstances; these unique circumstances, however, have never before justified a departure from general legal principles. The defenses of insanity and self-defense, for instance, apply both inside and outside the prison walls, *see, e.g., Vickers v. Stewart,* 144 F.3d 613 (9th Cir.1998) (involving a defendant-inmate asserting an insanity defense); *Lusk v. Dugger,* 890 F.2d 332, 336 (11th Cir.1989) ("Although incarceration in a state penitentiary might be a circumstance to be considered by a factfinder in assessing a claim of self-defense, the rule does not operate differently because the participants are behind bars."); indeed, we know of no defense made unavailable by the fact that the alleged crime occurred within a prison. The same principles that ordinarily underlie the duress defense persist within the prison context: there will be some circumstances, even within a prison, where social utility is maximized by the commission of a relatively minor offense. The applicable case law buttresses our conclusion in this regard. *See, e.g., United States v. Riffe,* 28 F.3d 565, 570 (6th Cir.1994) (concluding that a defendant-inmate was entitled to assert the duress defense); *Lopez,* 885 F.2d at 1434–36, 1438–39 (considering a duress defense to charges of aiding and abetting an escape from prison); *cf. United States v. Merchant,* 992 F.2d 1091, 1097–98 (10th Cir.1993) (holding that a defendant-inmate was not entitled to an instruction on the duress defense, but doing so on the grounds of a lack of evidence that the defendant feared for his safety rather than merely on the basis of the defendant's inmate status).

tion of death or bodily harm. The government argues that Mr. Haney's testimony that he was "not a hundred percent sure that [Mr. Francis] was going to try to follow through" with the escape, Francis Rec. vol. XV, at 1425 (testimony of Mr. Haney), establishes, as a matter of law, that the relevant threat could not have been an immediate one. We reject this notion. Mr. Francis testified to racially motivated threats upon his life in the context of simmering racial tension. *See id.* vol. XIV, at 1209–10 ("[M]ost everyone in the joint and even in the staff . . . believed that there was going to be a racial war on a riot type of scale. . . . I was going to be one of the first ones hit, killed."). Numerous witnesses substantiated the severe racial tension in the prison and the fact that, as a consequence of that tension, Mr. Francis had received a specific and credible threat upon his life. *See, e.g., id.* vol. XIV, at 1161–63; 1169–70 (testimony of Joseph McGee) (testifying to seeing the note that threatened Mr. Francis' life and further testifying to concerns, during September of 1997, about a racially motivated retaliatory murder in the Florence Penitentiary); vol. XV, at 1417–18 (testimony of Mr. Haney) (testifying that Mr. Francis told him, immediately following the September prison lock-down, of the threat upon Mr. Francis' life); vol XIII, at 816–23 (testimony of Wayne Smith) (testifying, as the then-Associate Warden of the Florence Penitentiary, regarding heightened concern in that prison, during August and September of 1997, of a racially motivated retaliatory murder); vol. XIV, at 1013, 1017–18 (testimony of Lewis Jordan) (testifying, as a then-inmate at the Florence Penitentiary, regarding heightened concern in that prison, during August and September of 1997, of a racially motivated retaliatory murder); vol. XIV, at 1053–54, 1056–57 (testimony of Ricky Montgomery) (same; also testifying to being stabbed,

while in the Florence Penitentiary, in a racially motivated incident).

Certainly the testimony of Mr. Francis, Mr. Haney, prison officials, and fellow inmates created a jury issue regarding the imminence of the threat against Mr. Francis' life. Mr. Haney's admission of some degree of uncertainty regarding whether Mr. Francis would execute the escape attempt creates, at best, some doubt regarding that imminence; Mr. Haney's admission in no way establishes, as a matter of law, that Mr. Francis faced no immediate threat of death or bodily harm.

## 2. Whether Mr. Haney presented sufficient evidence as to the third element of the duress defense

■ The third element of the duress defense requires that Mr. Haney and Mr. Francis have each lacked a reasonable legal opportunity to avert the threatened harm. The government notes that "evidence was presented that an inmate could get placed in protective custody through a variety of means, including with the assistance of another inmate." Aple's Br. at 19. The government points to the testimony of Mr. Francis and Paul Chartier, another inmate at the Florence Penitentiary. On cross-examination and re-cross-examination, respectively, both Mr. Francis and Mr. Chartier answered "yeah" in regard to a question as to whether Mr. Haney might have passed an anonymous note to the prison guards in order to have Mr. Francis involuntarily isolated. Francis Rec. vol. XIV, at 1241 (testimony of Mr. Francis); vol. XIII, at 869–71 (testimony of Mr. Chartier). In the government's view, Mr. Haney's exercise of that alternative would have averted the threatened harm to Mr. Francis (while also avoiding adverse collateral consequences [inmate-on-inmate violence]); thus, the proposed course of ac-

tion was a reasonable alternative to the possession of escape paraphernalia.

Again, however, the government confuses evidence that suggests the existence of such a reasonable alternative with evidence establishing, as a matter of law, the existence of such a reasonable alternative. Mr. Francis testified extensively regarding the risks inherent in engineering one's own check-in. *See, e.g., id.* vol. XIV, at 1210–12 ("You can be killed when you're labeled [as a check-in]."). Further, immediately following Mr. Chartier's "yeah" response noted above, Mr. Chartier added: "It's not an option, though, when you live that life." *Id.* vol. XIII, at 871 (testimony of Mr. Chartier). Other inmates testified along similar lines. *See, e.g., id.* vol. XIV, at 1028 (testimony of Lewis Jordan) (testifying regarding the consequences of becoming labeled as a check-in); vol. XIV, at 1059–60 (testimony of Ricky Montgomery) (testifying regarding the consequences of becoming labeled as a snitch); vol. XIV, at 1169–72 (testimony of Joseph McGee) (testifying regarding the consequences of becoming labeled as either a check-in or a snitch).

Given the opportunity, a jury certainly might have concluded that Mr. Haney could not claim the duress defense because either he or Mr. Francis possessed a reasonable alternative to the possession of escape paraphernalia. On the other hand, however, a jury could also have concluded that (1) if Mr. Francis had simply checked himself in, he would have exposed himself to an unreasonable risk and likewise (2) if Mr. Haney were to have engineered Mr. Francis' check-in, Mr. Haney would have exposed Mr. Francis to an unreasonable risk that fellow inmates would perceive Mr. Haney's actions to be at the behest of his friend Mr. Francis. In short, the jury could have concluded that neither Mr. Haney nor Mr. Francis in fact possessed any

reasonable alternative to the possession of escape paraphernalia. *See United States v. Riffe,* 28 F.3d 565, 570 (6th Cir.1994) (reversing and remanding for a new trial where the district court declined to provide jury instructions on the duress defense; noting that the defendant, a prisoner, presented at least some evidence by which the jury might have agreed that consulting the prison guards was not a reasonable alternative); *United States v. Merchant,* 992 F.2d 1091, 1097–98 (10th Cir.1993) (Ebel, J., dissenting) (concluding that a prison inmate accused of cocaine possession presented adequate evidence to create a jury issue as to the duress defense); *but cf. Merchant,* 992 F.2d at 1096–97 (holding, in a split decision, that a district court did not err in declining to afford instructions on the duress defense where the defendant, after being placed in segregation, "did not indicate any fear for his safety").

Because a jury could have concluded (1) that the threat against Mr. Francis was immediate in nature, (2) that Mr. Haney actually possessed a well-grounded fear that the threat would be executed, and (3) that neither Mr. Haney nor Mr. Francis, in order to avert the threatened harm, maintained any reasonable alternative to possessing escape paraphernalia, the district court should have granted Mr. Haney's request for jury instructions on the duress defense.

## III. CONCLUSION

For the reasons set forth above, we decline to limit the duress defense to defendants related by familial ties to a threatened individual and we further conclude that Mr. Haney presented adequate evidence to create a jury issue as to the applicability of that defense to his alleged possession of escape paraphernalia. Obviously we express no further opinion as to

the likely merits of Mr. Haney's duress defense. Should the government choose to retry this case, the government, with the duress issue now in play, may well produce overwhelming evidence as to either the non-immediacy of the threat against Mr. Francis or the existence of reasonable alternatives to the possession of escape paraphernalia. These, however, are considerations for a jury: we VACATE Mr. Haney's conviction and sentence and REMAND for further proceedings consistent with this opinion.